**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**                    :

   **- v. -**                    :

**WAYNE FRANKLYN CHINN,**                    :      **19 Cr. 915 (VM)**

       **Defendant.**                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT WAYNE FRANKLYN CHINN**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

OLGA I. ZVEROVICH
Assistant United States Attorney
NANETTE L. DAVIS
SEAN M. GREEN
Special Assistant United States Attorneys
- Of Counsel -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| - v. - | : | |
| **WAYNE FRANKLYN CHINN,** | : | **19 Cr. 915 (VM)** |
| **Defendant.** | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT WAYNE FRANKLYN CHINN

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Wayne Franklyn Chinn ("Chinn" or the "defendant"), which is scheduled for December 3, 2021, at 10 a.m.   Chinn pleaded guilty to one count of tax evasion for the calendar years 2001 through 2018, in violation of 26 U.S.C. § 7201.   As described in the Presentence Investigation Report ("PSR"), Chinn perpetrated a long-running and sophisticated scheme to evade his personal income taxes through the use of multiple offshore accounts, resulting in a combined loss of at least $789,219 to the Internal Revenue Service ("IRS").   As an experienced businessman with two prior federal convictions, including for tax crimes, Chinn understood his tax obligations full well.   Yet, time and time again, over the course of almost two decades, Chinn chose to cheat the system.   The Government respectfully submits that this serious criminal conduct warrants a sentence within the stipulated Guidelines range of 37 to 46 months' imprisonment (the "Stipulated Range") and that a lower sentence would fail to serve the essential sentencing goals of providing just punishment, affording general deterrence, and promoting respect for the law.

1

## I.      Factual Background

### A.  Chinn's Previous Felony Convictions

Prior to his retirement, Chinn was an investment advisor who had his own investment advisory firm.   (PSR ¶¶ 62-63).   Chinn previously pleaded guilty in two different federal criminal matters, one in the Southern District of New York in 1989, 87 Cr. 985 (RO) (PSR ¶ 30), and a second in the Northern District of California in 1990, 90 Cr. 46 (TEH) (PSR ¶ 31).   In the SDNY case, in which the Government alleged that Wedtech, a defense contractor, and government officials perpetrated a scheme to obtain no-bid defense contracts, Chinn ultimately pleaded guilty to submitting a false document to the Small Business Administration.[1]   (PSR ¶ 30).   In the NDCA case, Chinn pleaded guilty to wire fraud and filing a false tax return relating to fraud perpetrated on Marymount Palos Verde College (now known as Marymount California University).   (PSR ¶ 31).   After his release from prison, Chinn moved to Vietnam, where he currently resides.   Throughout the time of his criminal conduct in this case, Chinn also maintained an apartment in San Francisco, which he regularly visited.

### B.  Offense Conduct

As discussed in detail below, starting in approximately 2001, Chinn held millions of dollars in undeclared and untaxed funds at a Swiss private bank called Privatbank IHAG ("IHAG") in a series of five accounts, several of which Chinn held in nominee names.   (PSR ¶¶ 7-8).   Starting in late 2013, IHAG participated in the Department of Justice's Swiss Bank Program, which allowed eligible Swiss banks to disclose misconduct regarding its U.S. account holders to the Department of Justice ("DOJ"), provide statistical and other data, and pay a penalty, in exchange for a non-

---

[1] Chinn entered his guilty plea after the Second Circuit reversed his initial convictions and granted a new trial.

prosecution agreement.   IHAG paid a penalty of $7,453,000 and entered into a non-prosecution agreement on November 24, 2015.[2]

As part of its conduct disclosures to the DOJ, IHAG revealed that, while it was otherwise cleaning up its illegal U.S. cross-border business in 2009, IHAG senior management and employees conspired with employees of several Hong Kong and Singapore-based entities to conceal large U.S.-related accounts held at IHAG by three high-value U.S. taxpayer-clients, who did not want to disclose their undeclared assets to the U.S. tax authorities.   The scheme involved implementing "round trips" by which the U.S. clients' assets were moved out of IHAG, through several layers of nominee accounts at other offshore banks, and back to IHAG in nominee names. The purpose of the scheme was to further strip the U.S.-related accounts of any indicia of U.S. ownership to allow the U.S. clients to continue banking at IHAG while evading their U.S. tax obligations.[3]

Due to Swiss banking secrecy laws, IHAG refused to disclose to the Government the identity of one of the three U.S. taxpayer-clients who participated in the criminal scheme.[4]   As the

---

[2] A copy of the non-prosecution agreement and statement of facts detailing IHAG's criminal conduct is available at https://www.justice.gov/opa/file/795676/download.

[3] In September 2020, six individuals, including Rolf Schnellman and Ivo Bechtiger, and one Swiss financial services firm, Allied Finance Trust AG, referenced below, were indicted for their roles in this scheme. *United States v. Ivo Bechtiger et. al.*, 20 Cr. 497 (GHW).   The indictment against these defendants was unsealed in September 2021.   To date, none of the defendants has appeared in the United States to face the charge in that indictment.

[4] The remaining two U.S. taxpayer-clients who participated in the conspiracy eventually participated in the IRS's Offshore Voluntary Disclosure Program ("OVDP"), paying millions in back taxes, interest, and penalties.   The OVDP was a voluntary disclosure program designed for U.S. taxpayers with exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to report foreign financial assets and pay all tax due on those assets.   It provided taxpayers with protection from criminal liability in exchange for their resolving their civil tax and penalty obligations and cooperating with the U.S. government.   Chinn never attempted to enter the OVDP.

Government was able to learn only years later, through an extensive investigation and with the assistance of the Government of Singapore, the unidentified U.S. taxpayer-client was Chinn.   As described in detail below, in 2010, as part of the scheme, Chinn's undeclared funds were transferred from IHAG to and through nominee bank accounts in Liechtenstein and Hong Kong and then back to IHAG in new nominee accounts.   As intended, upon return, the accounts were stripped of their U.S.-related identities in order to successfully disguise Chinn's ownership of the accounts and thereby avoid disclosure to U.S. authorities.   In all instances, despite the use of nominee account holders, Chinn maintained control over the undeclared accounts.

Chinn's participation in the round-trip scheme in 2010 was only one part of his extensive tax evasion scheme, which continued for the better part of two decades.   As described below, Chinn's history of using undeclared bank accounts at IHAG to hide his assets and income dates back to at least 2001.   Moreover, even after leaving IHAG in 2012, Chinn continued to conceal his assets and income through undeclared accounts in nominee names at other banks in Singapore. Below is a detailed summary of Chinn's criminal conduct dating back to 2001.

### 1)  Chinn's Undeclared Accounts at IHAG (2001-2010)

Chinn controlled five separate undeclared accounts at IHAG between 2001 and 2010 in several different names: Dingbat, Dingbat 2, the Woon Foundation, Individual-1 (Chinn's long-time companion), and the Pira Foundation.    Chinn's undeclared accounts at IHAG held more than $5 million, which represented Chinn's undisclosed and untaxed income.    (PSR ¶ 7).   Ultimately, Chinn consolidated the funds in these undeclared accounts into the Pira Foundation account. Chinn's accounts are discussed in turn below.

### a)  The Dingbat Account

On August 10, 2001, Chinn opened numbered account ending in 0090, a/k/a "Dingbat," at IHAG.   He identified himself on account opening records as a U.S. citizen living in Vietnam.

Although Chinn opened and controlled the account, he identified his then ten-year-old adopted daughter ("Child-1") as the beneficial owner. His daughter had a Filipino passport and lived in France with her mother. When opening the account, Chinn signed a "Beneficial Owner's Declaration of Non-US-Status," stating that the purported account holder, his daughter, was not a U.S. citizen, U.S. resident, or U.S. taxpayer and, therefore, had no U.S. tax obligations.

### b) The Dingbat 2 Account

On March 5, 2007, Chinn opened a numbered account ending in 4902, a/k/a "Dingbat 2," at IHAG. Chinn's then 15-year-old daughter, Child-1, was identified as both the account holder and beneficial owner of the account. Child-1 signed a "Declaration concerning US status/non-US status" at the time the account was opened, stating that she was not a U.S. citizen, U.S. resident, or liable for tax in the United States for any reason.

On May 28, 2007, approximately $1 million was deposited into the Dingbat 2 account from the Woon Foundation, a Liechtenstein foundation purportedly operating for the benefit of Chinn's mother.[5] On October 3, 2008, Chinn closed the Dingbat account and had all funds transferred into the Dingbat 2 account. The Dingbat 2 account reached a high balance of $3,206,978. Although Child-1 was purportedly the beneficial owner of the account, Chinn regularly withdrew money for his own living expenses, including once withdrawing $250,000 for the purpose of "buying a house in Vietnam."

### c) The Woon Foundation Account

On November 24, 2008, Chinn opened a new account at IHAG in the name of the Woon Foundation. Chinn identified his mother as the beneficial owner of the account. On February 5,

---

[5] Although the Government's records are incomplete, these funds appear to have come from an account Chinn held in the name of Woon Foundation at Zürcher Kantonalbank in Switzerland.

2009, $2.1 million was transferred into the Woon Foundation account from Zürcher Kantonalbank in Zurich, Switzerland.   The Woon Foundation account at IHAG reached a high balance of $2,366,742.

### d)  The Individual-1 Account

On June 8, 2009, Individual-1, Chinn's long-term companion, opened a new account at IHAG.   Individual-1, who is a Malaysian national and resident, was identified as the account's beneficial owner.   Individual-1 gave Chinn power of attorney over the account.   Account opening records state that "USD 300,000 will come into her account as a gift from her boyfriend's family."   On June 25, 2009, $300,000 was deposited in the account.

### e)  The Pira Foundation Account

On or about June 9, 2009, Chinn opened a new account at IHAG in the name of the Pira Foundation, a Panamanian foundation controlled by Chinn, account ending in 1745.[6]   Once again, Chinn identified Child-1, who was 17 years old at the time, as the beneficial owner of the account.

After opening the Pira Foundation account, Chinn consolidated the assets from all of his undeclared accounts at IHAG into the Pira Foundation account.   Between in or about August 2009 and April 2010, Chinn's four other undeclared accounts were closed, and their balances, which totaled approximately $1,858,207 Swiss francs ("CHF") and approximately $2,173,999 USD, were transferred to the Pira Foundation account.

---

[6]  Significantly, the U.S. government's cross-border criminal tax enforcement began with the investigation of UBS AG, another Swiss bank.   That investigation first was made public in or about May 2008, with a deferred prosecution agreement announced in February 2009.   This case prompted many U.S. clients to make changes to the structure of their Swiss bank holdings.

### 2)   Chinn's Participation in the Round-Trip Scheme (2010-2011)

Starting in 2010, Chinn conspired with others, including executives and employees at IHAG, to implement a sophisticated round-trip scheme to avoid disclosing his accounts to U.S. authorities and to continue evading taxes.   (PSR ¶ 9).   As part of the scheme, Chinn's funds were transferred from the undeclared Pira Foundation account at IHAG, to and through foreign bank accounts held by nominees, and then back to IHAG in new nominee accounts, as described below.

First, in May 2010, Chinn's undeclared funds from the Pira Foundation account at IHAG, totaling CHF 4,193,312, were transferred to an account in Liechtenstein in the name of Swiss Internet Capital Group, Ltd. ("Swiss Internet Capital Group"), an entity created and controlled by a co-conspirator named Rolf Schnellmann.[7]   To facilitate this transfer, on May 5, 2010, Schnellmann, on behalf of the Swiss Internet Capital Group, and Individual-1, as the purported beneficial owner of the Pira Foundation, signed a fiduciary agreement, which Schnellmann provided to the bank in Liechtenstein.[8]

Next, in May 2010, Chinn's undeclared funds were funneled through an account at Standard Chartered Bank in Hong Kong held by Helvetic Investment Pte Ltd. ("Helvetic"), a new Singapore-based asset manager owned by IHAG's holding company.   Between May 10 and May 13, 2010, a total of CHF 4,057,004 in Chinn's undeclared funds was deposited in Helvetic's

---

[7]  Schnellmann was the CEO of Allied Finance Trust AG in Switzerland, a consulting firm that advised IHAG regarding the creation and implementation of the scheme.

[8]  The fiduciary agreement reflects Schnellmann's entitlement to a .6% acceptance fee, or approximately CHF 25,159.87.

account at Standard Chartered Bank.[9]

Finally, between May 2010 and July 2011, Chinn's undeclared funds were returned to IHAG and placed in newly opened accounts nominally held by Helvetic on behalf of two new nominee foundations, the Rosamunde Foundation and the Latvia Foundation.   These foundations were created and managed by a co-conspirator named Ivo Bechtiger, IHAG's former head of legal compliance, to allow Chinn to continue banking at IHAG through undeclared accounts. Bechtiger was the trustee of both foundations, and Individual-1 was the purported beneficiary.

The following chart shows the round trip of Chinn's undeclared funds out of IHAG, through Liechtenstein and Hong Kong, and back to IHAG in newly opened nominee accounts:



As intended, upon return, Chinn's accounts were stripped of their U.S.-related identities in order to successfully disguise Chinn's ownership of the accounts and thereby avoid disclosure to U.S. authorities.   In all instances, despite the use of nominee account holders, Chinn exercised control over his undeclared accounts.   In particular, although Individual-1 was purportedly the

---

[9] Schnellmann also instructed to transfer CHF 111,120 to Arron Foundation account at Neue Bank in Liechtenstein.   The Arron Foundation was a nominee entity used by Ivo Bechtiger.

beneficial owner of the Rosamunde Foundation and Latvia Foundation, Chinn continued to control

the funds after they returned to IHAG and directed Bechtiger, as trustee, regarding the disposition

of the funds, including the withdrawal of funds for Chinn's personal use.   Indeed, Bechtiger

regularly instructed Helvetic in writing to pay "cash on behalf of Rosamunde Foundation to Mr.

Frank Chinn in person" on particular dates.   In each instance, Chinn signed a document

confirming his personal receipt of cash.

### 3)  Chinn's Transfers of Undeclared Funds to Singapore (2011-2014)

In April 2011, Chinn's untaxed funds at IHAG started to make their way into new

undeclared accounts in Singapore.   The transfers of Chinn's funds to Singapore proceeded on two

tracks.   First, on or about April 8, 2011, a custody account at DBS Bank in Singapore was

established in the name of Helvetic on behalf of the Rosamunde Foundation.   Between April 8,

2011, and January 13, 2012, a total of $1,990,000 USD and HKD 8,000,000 of Chinn's undeclared

funds were transferred from the Rosamunde Foundation Helvetic account at IHAG to the new

Rosamunde Foundation Helvetic account at DBS Bank.[10]

Second, in early 2012, Chinn began working with Padang Trust Singapore Pte. Ltd.

("Padang Trust"), a trust company in Singapore, to create a new structure and open new accounts

for his undeclared offshore assets.   In January 2012, Padang Trust set up a company, Woon

Investment Ltd. ("Woon Investment"), in the British Virgin Islands.   In March 2012, pursuant to

instructions from Bechtiger, seven transfers of securities, worth over 1.46 million Swiss francs,

were made from the Rosamunde Foundation Helvetic account at IHAG to a newly opened account

---

[10] On or about April 13, 2011, Chinn and Individual-1 sent a letter to Bechtiger asking him to
"transfer all assets from Latvia Foundation to Rosamunde Foundation as they are in Privatbank
IHAG Zurich and close the account."   On or about April 26, 2011, all funds from the Latvia
Foundation Helvetic account at IHAG were transferred to the Rosamunde Foundation Helvetic
account at IHAG.

at IHAG, nominally held by Helvetic on behalf of Woon Investment.   On or about July 26, 2012, these securities were sold, and $1,200,000 was transferred from IHAG to a new custody account held by Helvetic on behalf of Woon Investment at DBS Bank in Singapore.   However, the Woon Investment account at IHAG still maintained cash and a gold bar.

Woon Investment was wholly owned by the Faan Trust, a trust Chinn established in Singapore.   Chinn was the settlor and, originally, the sole beneficiary of the Faan Trust, with Padang Trust as the trustee.   Chinn regularly wrote to Padang Trust requesting distributions of cash for his own "general living expenses" and withdrew over $80,000 in person.

On June 13, 2013, Chinn removed himself as a beneficiary of the Faan Trust and named his three children as the beneficiaries.   On July 4, 2014, Chinn removed his children as beneficiaries of the Faan Trust and listed the Vietnam Red Cross Society, Saigon Children's Charity, and "other such charitable or educational institutions" as the new beneficiaries of the trust.   Between May and October of 2014, Chinn personally withdrew $85,000 in cash from the trust.

On October 9, 2014, Chinn made Individual-1 the sole beneficiary of the Faan Trust and instructed Padang Trust to distribute all trust funds to Individual-1.   In a letter to Padang Trust, Chinn explained that Individual-1 "would like to set up a Trust with you as Trustees with herself as the sole beneficiary.   As such . . . instead of distributing the [trust funds] to her directly . . . I have no objections if the Trust Funds would be paid instead to the trust which [Individual-1] intends to set up."

In November 2014, at Chinn's direction, all of Chinn's remaining undeclared funds were transferred into three Padang Trust client accounts at Oversea-Chinese Banking Corporation ("OCBC") in Singapore, a large portion of which had hopped through Helvetic accounts at DBS Bank in Singapore.   The transfers of Chinn's undeclared funds into the three OCBC accounts were as follows:

| Date | Amount | Account Number (Ending) |
|---|---|---|
| November 14, 2014 | HKD 8,019,150.01 | 52-201 |
| November 17, 2014 | USD 2,213,425.56 | 49-301 |
| November 26, 2014 | CNH 5,933,785.04 | 02-201 |

Following these transfers, the funds quickly left the Padang Trust client accounts at OCBC and the majority of the funds ended up in accounts in the name of Individual-1's new trust at DBS Bank and OCBC.   Those funds, all of which were traceable to Chinn's undeclared and untaxed accounts, were ultimately frozen by the Singapore authorities and subsequently the subject of a civil forfeiture proceeding and settlement agreement in this district, as described further below.

Chinn did not report any of his undeclared accounts, or the untaxed income and assets in the accounts, to the IRS at any point through the end of 2018.   Chinn's long-running tax evasion scheme caused substantial losses to the IRS, totaling approximately $789,219 in unpaid taxes, not including interest or penalties.

### C. The Civil Forfeiture Action

As part of his plea agreement in this case, Chinn agreed to turn over 86% of the undeclared and untaxed funds held in accounts at DBS Bank and OCBC—which had been frozen by the Singapore authorities—to the Government as a penalty for willfully failing to report the accounts as required.   The Government, in turn, agreed that the remaining 14% of the funds would be distributed to Chinn assuming that he complies with his obligations in this case.

In order to effectuate that agreement, on May 1, 2020, the Government filed a civil forfeiture complaint seeking forfeiture of the frozen funds.   *United States v. Certain Funds on Deposit in Various Accounts Detailed Herein*, 20 Civ. 3397 (LKL).   Individual-1 and Padang Trust asserted claims to the funds.   The Government ultimately settled its claims with Individual-1 and Padang Trust, whereby Individual-1 received 3% of the funds (approximately $80,000), Chinn was allocated 14% of the funds (approximately $373,000, to be made available to him after the

date he reports for any sentence in this case), and the Government received 83% of the funds

(approximately $2,215,794.40).   Those funds were distributed by the Singapore authorities in late

2020.   The Government understands that the funds allocated to Chinn are held in escrow by

defense counsel.

### D.  Chinn's Guilty Plea and the Recommendation of the Probation Office

On December 19, 2019, Chinn pleaded guilty, pursuant to a plea agreement, to one felony

count of tax evasion for the calendar years 2001 through 2018, in violation of 26 U.S.C. § 7201.

In the plea agreement, the parties stipulated that the Guidelines range is 37 to 46 months'

imprisonment based on a total tax loss of more than $550,000 and less than $1,500,000.

The PSR contains the same Guidelines calculation as that set forth in the plea agreement.

(PSR ¶¶ 19-33).   The Probation Office recommends a sentence of 30 months' imprisonment,

explaining as follows:

> Chinn received two reduced sentences for his prior federal convictions.   Instead of
> taking this with grace and committing to a law-abiding lifestyle, Chinn proceeded to
> hide assets in order to avoid paying taxes, an action every American is responsible
> for.   This shows a lack of respect for the Government as well as the federal court
> system.   These actions also provide the understanding that the defendant was not
> deterred by his previous experience within the justice system or his bouts of
> incarceration.   This is a man whose integrity and honesty are severely
> compromised and his sense of entitlement is seemingly high.
>
> It is not lost on this office that the defendant is 78 years of age with several medical
> concerns, however, his involvement in the instant offense has taken place over a
> span of 18 years.   It was only less than eight years ago when the defendant was
> approximately 70, that he conspired with others to implement sophisticated means
> to continue to hide his accounts.
>
> We recognize the severity of the defendant's conduct and have balanced his role in
> the offense along with his personal characteristics in determining a
> recommendation.   Due to the circumstances mentioned above, focusing heavily on
> the fact that this is the defendant's third federal conviction, we believe a custodial
> sentence is warranted.   We believe a sentence of 30 months' imprisonment would
> be sufficient, but not greater than necessary, to comply with the factors to be
> considered in imposing a sentence outlined in 18 U.S.C. 3553(a).

(PSR at 20-21).   For the reasons discussed in detail below, the Government respectfully submits

that Chinn's prolonged, multi-faceted, and sophisticated tax evasion scheme warrants a sentence

within the Stipulated Range of 37 to 46 months' imprisonment, and that the mitigating factors

cited by the Probation Office, namely his age and health, do not support a downward variance in

this case.

## II.    Sentencing Legal Principles

The Guidelines are no longer mandatory, but they continue to play a critical role in trying

to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act,

namely, "ensuring similar sentences for those who have committed similar crimes in similar

ways."   *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397

F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section

3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked

at the whim of a sentencing judge.").   "[A] district court should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range," which "should be the starting point and

the initial benchmark."   *Gall v. United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is

thus "the lodestar" that "anchor[s]" the district court's discretion.   *Molina-Martinez v. United

States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087

(2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the

factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need

to reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the

need to protect the public from further crimes by the defendant; and d) the need for rehabilitation."

*United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

Section 3553(a) further directs the Court "in determining the particular sentence to impose" to

consider: (1) the nature and circumstances of the offense and the history and characteristics of the

defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the

kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the

Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities;

and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

III.   **Section 3553(a) Analysis**

The Government respectfully submits that a sentence within the Stipulated Range of 37 to

46 months' imprisonment is necessary to reflect the seriousness and aggravated nature of Chinn's

offense conduct, provide just punishment, afford deterrence, and promote respect for the law.

### A.  Nature and Circumstances of the Offense

Tax fraud is theft from the pockets of every taxpaying citizen of this nation.   The Supreme

Court has long recognized that "[t]he United States has relied for the collection of its income tax

largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from

him by those from whom income may be received."   *Spies v. United States*, 317 U.S. 492, 495

(1943).   A functioning government relies on its citizens and residents to report timely,

completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense

to file false returns or evade income taxes.   As Justice Oliver Wendell Holmes stated, "[t]axes are

what we pay for a civilized society. . . ."   *Compania General de Tabacos de Filipinas v. Collector*

*of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, *J.*, dissenting).

The pervasive tax fraud that Chinn perpetrated in this case cost the U.S. Treasury and this

nation's honest taxpayers hundreds of thousands of dollars in losses.   The magnitude of Chinn's

fraud itself warrants a sentence within the Stipulated Range.   Moreover, Chinn's offense conduct

14

is further aggravated by the manner in which he carried out his tax evasion scheme.   Chinn's crimes were not a one-time mistake or a fleeting lapse in judgment.   Rather, time and time again, over the course of nearly two decades, this defendant made a conscious and deliberate choice to defraud the U.S. government by hiding his untaxed funds offshore through the elaborate and sophisticated machinations described above.   This prolonged and serious criminal conduct warrants a term of incarceration within the Stipulated Range.

### B.  History and Characteristics of the Defendant

Despite a challenging early childhood, Chinn emigrated to the United States at a young age and became a naturalized citizen, finding success in the financial industry.   (PSR ¶¶ 38-41, 62-64).   Despite these privileges, as an adult, Chinn rejected a life of honesty and integrity and continued to break the law for many decades.   Chinn now stands *thrice* convicted of serious federal offenses and is a repeat federal tax offender.   In the instant offense, Chinn deliberately, and for many years, chose to cheat the tax authorities of hundreds of thousands of dollars over the course of many years.   Chinn clearly knew right from wrong; he knew that he was obligated to pay his fair share of taxes, if for no other reason by virtue of his prior federal criminal tax conviction.   And yet, unlike millions of hard-working taxpayers who timely file and pay their taxes each year, Chinn chose to evade his obligations through a multi-faceted and sophisticated tax fraud scheme that he and others carried out for many years, until he was finally caught.   Even then, it took the freezing of his nominee accounts in Singapore for him to come clean.   And, unlike the two other U.S. account holders at IHAG who participated in the scheme, Chinn never entered the OVDP.

While there certainly are cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this manifestly is not such a

case.   To the contrary, Chinn's long-running criminal conduct in this case is, unfortunately, consistent with his previous record of fraud offenses.   For nearly two decades, the defendant participated in multi-faceted tax fraud involving offshore accounts that were designed to cheat the IRS.   That cheating involved numerous forms of concealment, using Swiss bank accounts, Hong Kong bank accounts, a Panamanian foundation, a BVI company, a Singapore trust, and nominee corporate accounts.   For nearly two decades, Chinn methodically perpetrated a tax fraud designed to cheat the tax authorities out of large sums of money, and failed to file income tax returns and pay taxes, year after year.   This prolonged criminal conduct warrants serious punishment.

### C.  The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).   General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. An IRS study of tax compliance estimates that only 83.6% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $441 billion dollars in unreported and uncollected taxes.   *See* "Tax Gap Estimates for Tax Years 2011-2013," September 2019, *available at* https://www.irs.gov/pub/irs-pdf/p5364.pdf.   This means that hundreds of billions of dollars are lost every year because of tax cheats like Chinn—who choose to shirk their responsibilities as taxpayers but otherwise fully enjoy the myriad public benefits that the tax system supports.   This of course includes social security, a benefit that Chinn receives monthly.

Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing a sentence.   Meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud.   *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011)

("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases.   As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare.   As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.   Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.   Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt.   Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is at its peak in tax fraud cases, which are lucrative, easy to perpetrate, and difficult to detect.   *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

Offshore tax evasion is especially difficult to detect and remedy.   *See Taxing Hidden Wealth: The Consequences of U.S. Enforcement Initiatives on Evasive Foreign Accounts*, available at https://www.irs.gov/pub/irs-soi/19rptaxinghiddenwealth.pdf, at p. 2.   Identifying and catching

17

Chinn was the result of years-long efforts by the IRS and DOJ to thwart offshore tax evasion.   It took a concerted effort by the Tax Division of the Department of Justice, IRS Criminal Investigation Division, and the U.S. Attorney's Office in the Southern District of New York, and a dogged pursuit of Swiss banks that aided and abetted tax evasion by U.S. taxpayers.   *See, e.g.,* Swiss Bank Program, *available at* https://www.justice.gov/tax/swiss-bank-program.   Had one of the banks that Chinn used—Privatbank IHAG—chosen not to participate in the Swiss Bank Program, Chinn's sophisticated tax evasion likely would have gone undetected.   Thus, in order to provide adequate general deterrence, sentences in tax evasion cases must be substantial.

The Government anticipates that the defendant will request a sentence of probation, or alternatively a period of home confinement with monitoring.   The Government respectfully submits that such a sentence would fail *entirely* to serve the goal of general deterrence.   The message that would be sent to the community by such a sentence is that tax fraud is not a big deal and that a decades-long, sophisticated, lucrative tax fraud is, essentially, not worthy of punishment at all.   Such a sentence would provide a would-be tax cheat every incentive to perpetrate a tax evasion scheme—the reward is high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal (home confinement and the requirement to pay back the stolen money, which should have been paid to the Government in the first place).   Respectfully, that is *not* the message that this Court should send to the public through its sentence of Chinn.   As Judge Weinfeld aptly observed in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.   The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.   I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States v. Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13).   Judge Gardephe echoed the very same view in a more recent case involving a defendant who utilized an undeclared Swiss bank account and caused hundreds of thousands of dollars of tax loss, resulting in a Guidelines range of 24 to 30 months:

> Our tax system is, at bottom, a voluntary one.   Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct.   I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment.   There's nothing about the facts here that suggest to me that a different outcome is appropriate.

*United States v. Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50); *see also United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that a seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

In a case involving a business owner defendant who used unreported corporate receipts over a three-year period to pay payroll and personal expenses, resulting in a tax loss of between $250,000 and $550,000 and a Guidelines range of 18 to 24 months, Judge Hellerstein imposed an 18-month sentence on the 54-year-old, first-time offender, explaining that:

> I think the obligation to pay taxes is basic to our civilization.   It makes it possible to have a lawful society.   You read every day of crimes and violence in our country.   But so much so in so many other countries where people can't get out of their house without fearing their lives.   Where the path of getting food is strewn with threats and violence against them.

> In order to have a society, you must have money.   You must be able to pay what society requires.   And its basic functions of policing and other functions of making sure there is a safety net under people.   If people don't pay their taxes, they cheat each other.   Your not paying taxes cheats me.   If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here.   I think a year and a half, 18 months, is a just sentence.   I impose it.
>
> I think you're going to have to reflect on what you did and the seriousness of what you did.   You just can't make it good by paying the back tax.   You've got to understand that when  you do something bad, you get punished.   It's got to be a lesson to everyone else.   Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

(Sentencing Tr. at 22-23, *United States v. Joseph Ciccarella*, 16 Cr. 738 (AKH), Dkt. No. 19).

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no meaningful repercussions for willful failure to comply with the tax laws.   Sentencing Chinn to a significant term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment.   Or as Judge Hellerstein succinctly put it in *Ciccarella*: "You've got to understand that when you do something bad, you get punished."   *Id.*

### D.  The Need to Avoid Unwarranted Disparities

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences.   Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor that the Court must consider pursuant to 18 U.S.C. § 3553(a)(6).   To that end, the Government attaches for the Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case. (*See* Exh. A).   The sentencing chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts.

20

Although the Government believes that there is significant utility in having Your Honor consider sentencings in other tax cases, the Government understands that, at best, such guidance can get the Court only so far.   Every case is unique; every individual defendant is unique.   We do not mean to suggest otherwise.   The reason for our reference to the other relevant sentences is straightforward: while we recognize that the Government's recommendation in this case calls for a substantial sentence, the data shows that sentences within or slightly below the Guidelines range are common in criminal tax cases.   In fact, as the attached chart shows, defendants who have caused smaller losses to the IRS have received and served significant prison sentences.

IV.    **Chinn's Anticipated Arguments**

The Government anticipates that Chinn may advance several arguments in support of a downward variance in this case.   For the reasons set forth below, none of Chinn's anticipated arguments warrants a below-Guidelines sentence in this case, much less a sentence of probation.

A.  **Chinn's Age and Health**

First, Chinn may argue that a non-incarceratory sentence is appropriate given his age and health.   This argument should be rejected.   Chinn's age and medical conditions do not warrant a downward variance and certainly do not support a probationary sentence, which would be plainly unreasonable and contrary to the purposes of sentencing in this case.   *See Gall v. United States*, 552 U.S. 38, 50 (2007) (the district court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance").

Part H of the Sentencing Guidelines provide that departures based upon a defendant's age, medical health, and mental status "may be relevant" in imposing a sentence, but only when those characteristics "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."   U.S.S.G. §§ 5H1.2, 1.3, 1.4.   The Government believes that this principle is also relevant when the Court considers whether a variance under Section 3553(a) is

appropriate based on age or medical status.    The Government respectfully submits that Chinn's

status as a senior citizen is not unusual, particularly among white-collar and tax offenders, and

does not warrant a reduced sentence in this case.    In fact, as the attached sentencing chart shows,

courts have routinely imposed lengthy sentences on senior defendants in cases involving sustained

criminal conduct that results in significant harm.    As Judge Kaplan explained in *United States v.*

*Emanuel Cohen*, 15 Cr. 396 (LAK), in sentencing a 73-year-old, infirm white-collar defendant:

> With people in this age bracket, it is a very small number, really, from this social
> and economic bracket of society who can't make a medical case for avoiding
> incarceration of some level of persuasiveness or another. Sentences in cases like
> this, therefore, have to be cognizant of the need for people in general who, were
> they informed of the circumstances, to say well, this individual is going to pay a
> price for the crime, maybe not the same price that the individual would pay if he
> was a healthy 48-year old, but a serious price.
>
> There has got to be a perception that justice is done, that people get their just
> desserts, and that requires judges to impose sentences in some cases that if the
> sentences were considered only from the perspective of the defendant being
> sentenced might be harsher, more severe than might seem appropriate.

(Sentencing Tr. at 22, *United States v. Cohen*, No. 15 Cr. 396 (LAK) (S.D.N.Y. Sept. 29, 2016),

Dkt. No. 88).

Likewise, in *United States v. Murphy*, 11-CR-137 (C.D. Cal.), Judge David Carter

explained the vital importance of general deterrence, and the perception of equal justice, when

imposing a 97-month sentence on a 70-year-old white-collar defendant who had carried out a $2.9

million investment fraud scheme:

> I don't think a Court can allow you or somebody in a similar position to walk away
> from a sentencing, literally taking a round figure of 8, 9, 10, 11, 12 years, whatever
> that sentence is, and multiply that into a $3 million loss and, basically, make
> $300,000 a year on fraudulent activities. There, the government has a huge
> argument that I think the Courts need to pay attention to; and that is, not only you,
> but what's the deterrent value for people reading, hearing, or taking into account
> this kind of conduct?

> Is it that because we're older we can go out and commit these crimes, but somebody in the 40's gets 10 years? Somebody in their 70's get 41 months? I don't think so. I think you're just as accountable as a person who's 40 or 50.
>
> And maybe the argument could be made, with our life experiences—because I'm in the same age range as you—maybe just as accountable for our conduct after a lifetime of living and learning what's appropriate, ethical and right.

(Sentencing Tr. at 85-86, *United States v. Murphy*, No. 11 CR 137 (C.D. Cal. Aug. 2, 2013), Dkt. No. 99).

Similarly, Chinn's health does not warrant a downward variance.   Departure under Section 5H1.4 is rarely granted, and the cases in which the courts have found a physical impairment to be "extraordinary" generally are cases where medical care required by the defendant is demonstrated to be beyond the competence of the Bureau of Prisons ("BOP").   *See, e.g.*, *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995) (defendant "would only be entitled to a departure if his HIV had progressed into advanced AIDS, and then only if his health was such that it could be termed as an 'extraordinary physical impairment'"); *United States v. Guajardo*, 950 F.2d 203, 208 (5th Cir. 1991) (age, cancer, high blood pressure, fused right ankle, amputated leg, drug dependency insufficient to justify § 5H1.4 relief.   If the medical care required by a defendant is within the competence of the BOP, even a terminal illness does not constitute an "extraordinary physical impairment."   *Thomas*, 49 F.3d at 261.

In a similar case, a court sentenced a defendant on charges of fraud and bribery to imprisonment and denied a downward departure pursuant to USSG § 5H1.4 based upon age and infirmity.   *United States v. Turner*, 531 F. Supp.2d 123, 124-125, 127-28 (D.D.C. 2008).   At the time of the defendant's sentencing in *Turner*, the defendant had the following issues:

> [A]sthma requiring treatment with steroids and inhalers; sleep apnea requiring the use of a continuous positive airway pressure ("CPAP") device and oxygen at night; post-traumatic stress disorder resulting in headaches and seizures; congestive heart failure; gout and degenerative joint disease occasionally requiring treatment with narcotics; diabetes, which was treated by medication but not fully controlled; severe

peripheral neuropathy; renal failure; temporary spells of blindness; and a possible autoimmune disease such as lupus.

*Id*. at 127.   In denying the defendant's motion for downward departure, the court noted that the defendant's conditions were chronic rather than acute, and that the BOP could provide care for the defendant.   *Id*.   In *United States v. Tucker*, 986 F.2d 278, 280 (8th Cir. 1993) the Eighth Circuit reversed a district court's decision to depart downward for a defendant who suffered from stress associated with prosecution, degeneration of the jawbone, dizziness, eye trouble, frequent colds, tooth problems, shortness of breath, heart palpitation, arthritis, cramps in her legs, a painful shoulder, knee problems, pressure in her chest, and who had clinically died for 4 minutes during a surgery.   The Eighth Circuit noted that the Guidelines indicate that "departures were intended to be quite rare, and thus should be restricted to situations in which substantial atypicalities are found to exist."   *Tucker*, 986 F.2d at 280; *see also United States v. Kurland*, 718 F. Supp.2d 316, 318 (S.D.N.Y. 2010) (imposing a custodial sentence and finding that medical issues of defendant convicted of securities fraud, including hyperlipidemia, diabetes mellitus, and prostate cancer in remission, did not warrant a downward departure).

Chinn's medical issues, discussed in the Presentence Report, are not unusual for someone his age, are not atypical for tax fraud defendants, who tend to be older, and can be monitored and addressed by the BOP.   (*See* Exh. B (letter from Health Services Administrator for the BOP Northeast Region) at 3 ("Based on the information provided to me and my knowledge of the BOP's medical resources, the BOP will be able to provide appropriate care for Mr. Chinn should he be sentenced to a term of incarceration and committed to the custody of the BOP.")).   The cases cited herein involve defendants with similar health problems, none of which warranted a non-custodial sentence.   Moreover, many of the tax defendants cited in the Government's sentencing chart were in their 60's and 70's and nonetheless appropriately received significant

periods of incarceration based on the serious nature of the conduct.   To the extent that the Court believes it appropriate, the Court can recommend that the defendant serve his sentence in a BOP medical facility.

In sum, like the defendants in the above-described cases, Chinn persisted in his crimes for many years.   He chose to perpetrate a serious, sophisticated tax fraud for decades, year after year, well into his 70s and well after ███████████.   Having made that choice, Chinn should not be able to claim now that his age and health are significant mitigating factors or warrant a non-incarceratory sentence.   As Judge Berman observed last year in sentencing an 83-year-old defendant with multiple health conditions to 48 months' imprisonment for offshore tax fraud: "It can't be that you could commit so many crimes for so long a period in such an excessive amount and then say: I'm 83, pandemic, home confinement. It's just not in the realm of justice, in my opinion."   (Sentencing Tr. at 57, *United States v. Harald Joachim von der Goltz*, 18 Cr. 693 (RMB), Dkt. No. 251).[11]

### B.  COVID-19 Pandemic

The Government anticipates that Chinn may also argue that the COVID-19 pandemic justifies a downward variance from the Stipulated Range.   This argument, too, should be rejected. While the pandemic certainly poses unique challenges in the prison context, it does not just justify a below-Guidelines sentence in this case.   Since January 2020, the BOP has implemented, and

---

[11] Notably, defendant von der Goltz, who is older than Chinn, had multiple serious health conditions at the time of his sentencing, which took place during the COVID-19 pandemic before the availability of vaccines.   Specifically, von der Goltz had long-term cardiovascular issues, suffered a double heart attack in 2018, requiring the insertion of three stents and a pacemaker, and suffered from an irregular heartbeat, high blood pressure, poor kidney function, arthritis of the spine, a stomach hernia, an inflamed esophagus, asthma, and certain life-threatening allergies.   (Sentencing Tr. at 26; *see also id.* at 24-25).   Judge Berman recommended that von der Goltz be designated to serve his sentence at a medical BOP facility.

continues to implement, significant protocols to prevent the spread of COVID-19 and ensure the safety of BOP inmates and staff.   Chinn is fully vaccinated.   While the pandemic undoubtedly calls upon the BOP to continue exercising serious consideration in providing protection and care to inmates, there is no indication that the BOP would fail to do so during any custodial sentence.

Finally, and most fundamentally, the Court has other mechanisms to address the pandemic than simply declining to impose a term of incarceration.   If the Court still believes that incarceration at this time would expose the defendant to an unnecessary health risk, the Government respectfully submits that the appropriate solution would be to delay Chinn's surrender date, not to impose a below-Guidelines or non-custodial sentence that would be otherwise contrary to the Section 3553(a) factors.

## V.    <u>Restitution</u>

For the reasons set forth below, the Government respectfully submits that Chinn should be ordered to pay restitution to the IRS in the amount of $789,219.

### A.  Legal Framework

Restitution is concerned with the victim's actual loss because "the purpose of restitution is essentially compensatory."   *United States v. Boccagna*, 450 F.3d 107, 115, 119 (2d Cir. 2006). The Government bears the burden of proving a victim's actual loss by a preponderance of the evidence.   *United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012) (citing 18 U.S.C. § 3664(e)). "District courts have broad discretion in the sources of information they may consider when ordering restitution, though hearsay evidence must have 'some minimal indicia of reliability' in order to comply with the Due Process Clause of the Fourteenth Amendment."   *United States v. Denault-Reynolds*, 810 F. App'x 38, 40 (2d Cir. 2020) (summary order) (citation omitted); *see also United States v. Pierre*, 285 F. App'x 828, 829 (2d Cir. 2008) (summary order) ("The District Court did not abuse its discretion in choosing not to hold a hearing before ordering restitution. . . .

Neither the Due Process Clause nor the federal Sentencing Guidelines required the district court to hold a full-blown evidentiary hearing to decide a dispute about a proposed restitution order.").

"The district court need not establish the loss with precision but rather 'need only make a reasonable estimate of the loss, given the available information.'" *United States v. Carboni*, 204 F.3d 39, 46 (2d Cir. 2000). "A district court may make a reasonable estimate 'by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown.'" *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009); *see also, e.g.*, *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) ("A court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding.").

**B. Discussion**

In his plea agreement, Chinn agreed to make restitution to the IRS in an amount to be specified by the Court for the calendar years 2001 through 2018. (PSR ¶ 14). The amounts deposited into Chinn's undeclared offshore bank accounts were untaxed funds. (*See* PSR ¶ 7). IHAG records reflect that the balance of Chinn's Pira Foundation account (into which Chinn's undeclared funds had been consolidated) was CHF 4,193,312 as of May 5, 2010, when the funds were moved to Liechtenstein. (*See* Exh. C (IHAG account record)). Converting that balance to U.S. dollars using an exchange rate as of May 5, 2010 ($.89 to 1 Swiss franc) yields a U.S. dollar balance of $3,732,048. Calculating the tax liability using a capital gains rate of 20% (rather than the higher ordinary income rate) results in a tax loss of $746,409. Additionally, based on the bank records in the Government's possession, Chinn owes $69,563 for unpaid taxes on additional investment income for the years 2007 through 2012. (*See* Exhs. D & E (Form 4549-A, Foreign Bank Account Analysis)). But to avoid the risk of double counting, the Government

conservatively seeks to add only the investment income for 2011 and 2012, or $42,810, to the amount of tax loss calculated through 2010.   Adding $42,810 to the $746,409 tax loss results in a restitution figure of $789,219.

The Government's restitution calculation is conservative in at least two ways.   First, the Government used the lower capital gains rate, rather than the higher ordinary income rate that likely would like to Chinn's untaxed income.   Second, the Government's proposed restitution figure does not include statutory interest, given the complexities of determining that amount. Such an estimated restitution amount comports with Second Circuit law that holds that "a 'reasonable approximation' will suffice, especially in cases in which an exact dollar amount is inherently incalculable."   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) (citations omitted); *see also United States v. Kerekes*, 531 F. App'x 182 (2d Cir. 2013) (summary order) (In fraudulent tax shelter case, "the district court's decision to adopt a conservative estimate of the government's losses using a 20% capital gains tax rate was within its discretion.").   The Government respectfully requests that the Court order restitution to the IRS in the amount of $789,219.

**VI.** **Conclusion**

On the facts of this case, a sentence within the Stipulated Range of 36 to 47 months in prison is appropriate and just.   Such a sentence would reflect the seriousness of Chinn's crimes, afford just punishment, and send a message to would-be tax cheats that a meaningful jail term is the likely consequence of such criminal conduct.   By contrast, a sentence involving minimal or no prison time would be perceived by the public as a slap on the wrist and would fail to deter anyone from flouting the tax laws.   Accordingly, the Government respectfully requests that the Court impose a sentence within the Stipulated Range and order restitution to the IRS of $789,219.

Dated:  New York, New York
        November 29, 2021

                    Respectfully submitted,

                    DAMIAN WILLIAMS
                    United States Attorney

By:    _____/s/_____
             Olga I. Zverovich
             Assistant United States Attorney
             (212) 637-2514

             Nanette L. Davis, Senior Litigation Counsel, Tax
             Division
             Sean M. Green, Trial Attorney, Tax Division
             Special Assistant United States Attorneys
             (202) 514-8030 / (202) 532-3764